Stephen M. Lobbin (SBN 181195)
slobbin@onellp.com
**ONE LLP**
4000 MacArthur Boulevard
East Tower, Suite 500
Newport Beach, California 92660
Tel:   949.502.2870
Fax:   949.258.5081

Attorneys for Plaintiffs **Crafty Productions, Inc.** and **Crafty Productions, LLC**

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **Crafty Productions, Inc.**, a California corporation, and **Crafty Productions, LLC**, a California company, <br><br> Plaintiffs, <br><br> v. <br><br> **Fuqing Sanxing Crafts Co. Ltd.**, a China company, **Tony Zhu**, an individual, **MRF Associates, Inc.**, a Massachusetts corporation, **Michelle Faherty**, an individual, **The Michaels Companies, Inc.**, a Delaware corporation, **Michaels Stores, Inc.**, a Delaware corporation, **Plaid Enterprises, Inc.**, a Georgia corporation, **Hobby Lobby, Inc.**, an Oklahoma corporation, **Sbars, Inc.**, a New Jersey corporation, **A.C. Moore Arts & Crafts, Inc.**, a New Jersey corporation, **99 Cents Only Stores, Inc.**, a California corporation, **Dollar Tree, Inc.**, a Virginia corporation, **Jo-Ann Stores, LLC**, an Ohio company, **Party City Holdings, Inc.**, a Delaware corporation, **Party City Corporation**, a Delaware corporation, **ZheJiang HongYe Co. Ltd.**, a China company, **Fuzhou Bomy Trading Co., Ltd.**, a China company, **Fuzhou Great Suns Co. Ltd.**, a China company, **Sunface Crafts Co. Ltd.**, a China company, <br><br> Defendants. | Case No. <u>'15CV0719 BAS JLB</u> <br><br> **COMPLAINT FOR COPYRIGHT INFRINGEMENT, FALSE DESIGNATION OF ORIGIN, INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE, UNFAIR COMPETITION, BREACH OF CONTRACT, AND FRAUD** <br><br> **DEMAND FOR JURY TRIAL** |

-1-

For its Complaint, Plaintiffs Crafty Productions, Inc. ("CPI") and Crafty Productions, LLC ("CPL") hereby allege as follows:

## JURISDICTION AND VENUE

1.     This is an action including for infringement under the United States Copyright Act, 17 U.S.C. § 101, *et seq.*, and Lanham Act, 15 U.S.C. § 101, *et seq.* This Court has subject matter jurisdiction over these claims under 28 U.S.C. §§ 1331 and 1338, and over the remaining claims under 28 U.S.C. § 1367(a).

2.     This Court has personal jurisdiction over the Defendants because each regularly conducts business in California and has committed the infringing and illegal acts alleged herein in California.

3.     Venue is proper in this Judicial District under 28 U.S.C. §§ 1391(b) and 1400(a), and 18 U.S.C. § 1965.

## PARTIES

4.     Plaintiff CPI is a California corporation having an Internet home page at <craftandplay.com>, and Plaintiff CPL is a California company, each having its principal place of business at 1050 Guilford Court, Encinitas, California 92024. Paula Mello ("Mello") is founder, owner and President of CPI, which is the majority owner of CPL.

5.     CPI owns all of the copyrights, trademark rights and other intellectual property rights asserted herein, and has registered and/or applied to register all such rights permitting registration.

6.     Upon information and belief, Defendant Tony Zhu ("Zhu") is owner and principal of Defendant Fuqing Sanxing Crafts Co. Ltd., a company having its principal place of business at #3 Ke Ma Building, Yuan Hong Investment Zone, Cheng Tou Twon, Fuqing City, Fujiang Province, 350314 PR China.

7.     Upon information and belief, Defendant Michelle Faherty ("Faherty") is owner and principal of Defendant MRF Associates, Inc., a corporation having its

1    principal place of business at 224 Dutcher Street, Hopedale, MA 01747, and having

2    an Internet home page at <mrfassociates.blogspot.com>.

3         8.     Upon information and belief, Defendants The Michaels Companies,

4    Inc. and its wholly-owned subsidiary Michaels Stores, Inc. (collectively "Michaels")

5    are corporations having their principal place of business at 8000 Bent Branch Drive,

6    Irving, TX 75063, and having an Internet home page at <michaels.com>.

7    According to its website, Michaels is North America's largest specialty retailer of

8    arts, crafts, framing, floral, wall decor, and seasonal merchandise for the hobbyist

9    and do-it yourself home decorator.

10        9.     Upon information and belief, Defendant Plaid Enterprises, Inc.

11   ("Plaid") is a corporation having its principal place of business at 2331 Mellon

12   Court, Decatur, Georgia 30035-3808, and having an Internet home page at

13   <plaidonline.com>.  According to its website, Plaid is "one of the world's largest,

14   most diverse manufacturers of creative do-it-yourself products."

15        10.    Upon information and belief, Defendant Hobby Lobby Stores, Inc.

16   ("Hobby Lobby") is a corporation having its principal place of business at 7707

17   S.W. 44th Street, Oklahoma City, OK 73179, and having an Internet home page at

18   <hobbylobby.com>.  Hobby Lobby operates over 600 stores across the U.S., is an

19   industry leading retailer offering more than 70,000 arts, crafts, hobbies, home decor,

20   Holiday, and seasonal products, and claims to operate "in a manner consistent with

21   Biblical principles."

22        11.    Upon information and belief, Defendant Sbars, Inc. ("Sbars") is a

23   corporation having its principal place of business at 14 Sbar Boulevard,

24   Moorestown, NJ 08057, and having an Internet home page at <sbarsonline.com>.

25   Sbars operates a 300,000 square foot craft and hobby supply distribution center, and

26   carries over 30,000 SKUs of brand name merchandise and proprietary products sold

27   under the Nicolecrafts label.

28

COMPLAINT
Case No. _____

12.     Upon information and belief, Defendant A.C. Moore Arts & Crafts, Inc. ("A.C. Moore") is a corporation having its principal place of business at 130 A.C. Moore Drive, Berlin, New Jersey 08009, and having an Internet home page at <acmoore.com>. A.C. Moore is a specialty retailer operating more than 140 stores offering a vast selection of arts, crafts and floral merchandise to a broad demographic of customers. Since October 2011, A.C. Moore has been owned by Sbars.

13.     Upon information and belief, Defendant 99 Cents Only Stores, Inc. ("99 Cents Only") is a corporation having its principal place of business at 4000 Union Pacific Avenue, City of Commerce, CA 90023, and having an Internet home page at <99only.com>. 99 Cents Only is a premier deep-discount retailer that offers a wide selection of products from everyday household items to seasonal and party merchandise including decorations, costumes and gifts.

14.     Upon information and belief, Defendant Dollar Tree, Inc. ("Dollar Tree") is a corporation having its principal place of business at 500 Volvo Parkway, Chesapeake, VA 23320, and having an Internet home page at <dollartree.com>. Dollar Tree is the leading operator of single-price-point dollar stores, with more than 4,900 stores in all 48 contiguous states and 5 Canadian provinces.

15.     Upon information and belief, Defendant Jo-Ann Stores, LLC ("Jo-Ann") is a company having its principal place of business at 5555 Darrow Road, Hudson, OH 44236, and having an Internet home page at <joann.com>. Jo-Ann is the nation's leading fabric and craft specialty retailer, operating approximately 850 stores in 49 states and offering a variety of merchandise used in sewing, crafting and home decorating projects, including fabric, notions, crafts, frames, paper crafting supplies, artificial floral, finished seasonal and home decor items.

16.     Upon information and belief, Defendants Party City Holdings, Inc. and its wholly-owned subsidiary Party City Corporation (collectively "Party City") are corporations having their principal place of business at 80 Grasslands Road,

Elmsford NY 10523, and having an Internet home page at <partycity.com>. According to its website, Party City is "America's largest specialty party goods chain and the country's premiere Halloween specialty retailer," and operates more than 800 company-owned and franchise stores throughout the United States and Puerto Rico.

17.    Upon information and belief, Defendant ZheJiang HongYe Co. Ltd. is a company having its principal place of business at The Industrial Park, Wenling City, ZheJiang, 325805 PR China.

18.    Upon information and belief, Defendant Fuzhou Bomy Trading Co. Ltd. is a company having its principal place of business at Rm. 815, 8/F Tico Plaza No. 92, Liuyi North Road, Fuzhou, China.

19.    Upon information and belief, Defendant Fuzhou Great Suns Co. Ltd. is a company having its principal place of business at Rm. 605, 18/F Zhan Qi Plaza, 156 Dong Pu Road, Fuzhou 350003, Fujian, China.

20.    Upon information and belief, Defendant Sunface Crafts Co. Ltd. is a company having its principal place of business at Shidun Developing Zone, Dehua, Quanzhou, Fujian, China.

21.    If and when other manufacturers, distributors or retailers of the accused products are ascertained who also may be subject to the personal jurisdiction of this Court, Plaintiffs may seek leave to amend this Complaint.

## GENERAL ALLEGATIONS

22.    Since at least 1994, when it won the "Most Innovative New Product" award at the annual Hobby Industries of America trade show, CPI has been a creative leader and trend-setter in the crafts industry, and has created many original product concepts and designs, including many creative, decorative wood products. Many of CPI's original designs and products relevant to this action are shown in the attached Exhibits A-H.

23.     Although CPI once had annual U.S. sales (in 2009) of more than $7 million, because of the consistent, widespread infringement and unfair competition discussed herein, by 2014 CPI's annual U.S. sales had fallen to barely $2 million, with much smaller profit margins because of the price competition resulting from intellectual property infringement and "factory direct" sales from China.

24.     In about 1995, CPI hired Michelle Faherty as a sales representative for some of CPI's products.  While CPI was working with a factory called Greensward, Faherty requested permission to take samples of CPI's products in order to obtain a manufacturing cost estimate from a factory she knew in China.  Because the manufacturing cost estimate represented a cost savings, CPI began using this manufacturer, which CPI later learned was a factory in China owned by Kevin Xiao and/or Tony Zhu.

25.     Between 2002 and 2012, CPI sent Faherty almost all of its products and designs (approximately 10,000 or more) to have samples made and priced by manufacturers in Asia.  As CPI later learned, Faherty was acting as a "middle man" between CPI and factories owned (at least partially) by Zhu, including what Faherty called, at various times, "Fuzhou Great Suns," "Fuzhou Bomy Trading Co. Ltd.," "Fuzhou 4 Kids Company Manufacturing Ltd.," and "Fujian Great H.Z.X. Import and Export Co."  In 2012, Zhu informed CPI that Faherty no longer worked with him and had left his organization and started another company.

26.     In about 2009 or 2010, one of CPI's Canadian distributors, HA Kidd, showed CPI a crafts and toys product catalog from "Zhejiang Hongye Art & Craft Co., Ltd." (also known as "Hongye"), in Zhejiang Province, China.  This catalog included infringing replicas of much of CPI's product line for sale, which had never been authorized by CPI.  Many of the products were exact or substantially similar replicas of CPI's original designs and products.  CPI had never heard of Hongye, and it was not one of CPI's past or then-current manufacturers.

27.     In 2009 or 2010, CPI learned through "Import Genius" <importgenius.com> that the Hongye factory was shipping wood products to Michaels and to Plaid.  Through Faherty and only after much delay insisted on by her, in 2010 CPI visited China in order to meet Zhu and see the manufacturing facilities Faherty had arranged to produce CPI's many original designs and products.

28.     Faherty arranged a visit to the Hongye factory, where CPI was only permitted to see a showroom rather than any manufacturing activity.  In the showroom, there was an entire layout of many of CPI's original designs and products.  Faherty explained that the visit to the showroom was possible only by her pretext given to the representative who greeted us, stating that "one thing my father taught me was how to lie real good."  There appeared to be no effort by the manufacturer to disguise the fact that they were producing unauthorized CPI products.

29.     After leaving Hongye in 2010, CPI went to another town called Fuzhou to see Zhu's factory where Faherty supposedly was having CPI's products manufactured.  The visit revealed just a bit of machinery, including some silk screening machinery, but none for cutting wood which would have been required to manufacture CPI's products.  There were some workers putting CPI's products in packaging.  They also had an entire showroom with CPI's products all over the walls very similar to the way CPI had products displayed in its warehouse.  Zhu stated he put the display up for the visit.  The Hongye factory showroom, which supposedly was not making products for CPI, had significantly more of CPI's products in their factory than Zhu's factory which was supposedly manufacturing CPI's products.  Hongye's products included blatant "knock-offs" of CPI's original designs and products throughout many years, as well as products substantially similar to CPI's products.

30.     The Fuzhou factory had a frame that was substantially similar to one of CPI's designs, and the frame had the name "Plaid" on the back of it with a 2010 date

COMPLAINT
Case No. _____

on the UPC code.  Plaid supplies products to many retailers in the industry, including Walmart, Hobby Lobby and Michaels.  Walmart's wood products typically carry the "Plaid" brand name, and typically are substantially similar to CPI's original designs.  After noticing the reference to Plaid, Faherty announced, "In the past we have worked with some of your competitors, but we are in partnership with you and we will produce only for you."  Apparently, Faherty and Zhu had cleared out all of CPI's products being manufactured for competitors for purposes of the visit, but accidentally left one frame behind.

31.     During the visit, the Fuzhou factory had no other production going on in what was an enormous factory floor.  There was, however, an architectural drawing depicting a gigantic factory which Zhu was building across the street.  CPI was never shown any manufacturing of CPI's products, either at the Fuzhou or Hongye factory facilities.

32.     Before CPI visited the Fuzhou factory in 2010, Faherty had e-mailed a picture of a whole planogram set of Plaid's products.  Some of the products were substantially similar to CPI's original designs and products.  Specifically, in a January 26, 2010 e-mail (Exhibit B at 1), Faherty stated: "Here are some images of items Plaid is going to present to Michaels for an appointment they have soon.  Let me know if you want me to rush any samples to you."

33.     Upon information and belief, for many years, Faherty and Zhu have been enabling the manufacture in China of products that are "knock offs" or substantially similar to CPI's original designs and products, for sale to Plaid and others for ultimate retail sale in the United States and elsewhere.  While in China, Faherty and Zhu did not want CPI to see competitors' products in the same factory. Plaid and others have been able to undercut CPI's pricing on "knock off" or substantially similar products, in order to divert sales to themselves that would have otherwise gone to CPI as the sole source of its original designs and products.

34.     On information and belief, Faherty previously worked for Plaid.

COMPLAINT
Case No. _____

35.     In about May 2012, CPI reminded Faherty that she was not authorized to manufacture or sell any original CPI designs or products to anyone but CPI or its customers.  In response, Faherty stated that as long as she and Zhu were partners, they would not sell to CPI's competitors.  Attached hereto as Exhibit I is a true and correct copy of an e-mail from Faherty dated June 1, 2012.  Further, Faherty, Zhu and Kevin Xiao signed a non-disclosure agreement concerning CPI's proprietary and/or confidential information.  Attached hereto as Exhibit J is a true and correct copy of the signed agreements dated June 16, 2012.

36.     On September 27, 2012, Import Genius contacted CPI and provided a "link analysis" showing that CPI's manufacturer in China was selling the same products not only to us, but also to Plaid out of the same factory.  Attached hereto as Exhibit K is a true and correct copy of the link analysis.

37.     Because of the devastating effect of the many years of "knock offs" and substantially similar designs and products being manufactured in China and undercutting CPI's prices in the United States market, in 2012 CPI engaged a business broker to sell the business.  Because CPI believed no American company would buy CPI, knowing that most of the craft industry was "going direct" to China, CPI pursued potential buyers in China, starting with Zhu.

38.     Before CPI would negotiate, Faherty, Zhu, and Kevin Xiao sign a Non-Disclosure Agreement which was much more involved than the prior agreement, including a prohibition on selling CPI's original designs and products to CPI's competitors.  Attached hereto as Exhibit L are true and correct copies of these NDA's, signed on October 9, 2012.

39.     Ultimately, Zhu made an offer in writing to purchase CPI for $2,000,000.00.  Attached hereto as Exhibit M is a true and correct copy of this offer, dated October 29, 2012.  Later, Zhu backed out of his offer, giving an excuse that he had invested his money into some other company in Hong Kong.  Zhu later told Helen Lee (a friend "Lee" who translates between CPI and Zhu) that Faherty told

COMPLAINT
Case No. _____

1  him he didn't need to purchase CPI because Faherty could just hire a new product

2  developer and designer.  CPI knew that Zhu and Faherty already had CPI's entire

3  library of products and designs over many years, which could be copied or used to

4  create derivative designs.

5        40.    In early 2014, CPI reached a series of agreements with Zhu, true and

6  correct copies of which are attached hereto as Exhibits N-Q.  Pursuant to the

7  February 11, 2014 Contribution Agreement, Zhu's company Fuqing agreed to

8  purchase a 33% ownership interest in CPL.  Pursuant to Section 1.14 of the

9  Contribution Agreement, Fuqing agreed to contribute $100,000 to CPL on or before

10  December 1, 2014.  This payment is now past due and Fuqing is in material breach

11  of the Contribution Agreement.  In addition, Fuqing was obligated to provide a

12  quarterly sales report to CPL, listing all sales of products sold under the non-

13  exclusive license granted pursuant to Section 1.6 of the Contribution Agreement.

14  This sales report and associated royalty payment also are past due.  These breaches

15  of the Contribution Agreement are discussed in CPI's February 11, 2015 letter to

16  Fuqing, attached hereto as Exhibit R.  Finally, pursuant to Section 4 of the

17  Consulting Agreement, Fuqing agreed to pay CPI "a consulting fee of $100,000.00 .

18  . . commencing on March 1, 2015, and on the 1st day of each year thereafter."  The

19  March 1, 2015 payment is now past due, and Fuqing is now in material breach of the

20  Consulting Agreement.

21        41.    In October, 2014, Faherty emailed Mello and asked to meet.  CPI

22  believed the invitation for a meeting was at Zhu's request and to talk about the

23  future of CPI and why CPI had not placed many product orders with Zhu's factory.

24  Around this time, Zhu was trying to get Lee to come to his factory.

25        42.    At the meeting at Mimi's in Orange County on November 6, 2014,

26  Mello asked Faherty why she wanted to meet.  Faherty stated she thought Mello

27  thought she did things that she never did, such as the Hongye factory.  Mello

28  reminded Faherty that (a) competitors had tons of products that were "knock offs"

COMPLAINT
Case No. _____

or substantially similar to CPI's original designs and products, (b) Faherty had access to all of CPI's artwork to take to China as a "middle man" to have samples made, (c) CPI had paid close to $18,000,000.00 to factories that Faherty was associated with over the years.  Also, there are pictures of CPI's products in the A.C. Moore planogram room with a letter attached with Faherty's signature on it (Exhibit D at 2).  This letter was written to Drew at Sbars and on the back of the products there was Hongye's name.

43.     The only way the Hongye factory could have gotten CPI's products was if a retail buyer or Faherty or someone else brought CPI's designs to the Hongye factory.  Likely both scenarios were happening, especially because Michaels was so concerned when CPI informed them (specifically including the buyer Lori and her boss, Michelle Ruocco) that CPI had been to the Hongye factory and knew Michaels was buying from the Hongye factory.  Faherty also stated previously that buyers often give samples to the factories, and/or factory representatives come to the U.S. to buy products and bring them back to China.  There were CPI items in the Hongye factory, however, that were never sold and had only been given to Faherty and buyers, which means those products could only have reached China via Faherty or one of the retail buyers in the U.S.

44.     During the 2014 meeting between Faherty and Mello, Faherty admitted that (a) she had sold CPI's wood products to the 99 Cent Only Store, (b) she had sold CPI's products to Hobby Lobby, (c) she had sold CPI's products to Jo-Ann's.

45.     Zhu also admitted he was selling CPI's products (dolls and stand ups) to the 99 Cent Only Store.  Attached hereto as Exhibit S is a true and correct copy of a confirming e-mail relayed from Zhu.

46.     CPI normally sells Jo-Ann's a $600,000 order which ships in February.  When CPI received this year's order in November 2014 to ship in 2015, it was only a $165,000 order of only dollar wood kids' products.  None of the other new items CPI had developed were purchased.

47.     CPI is seeing the same pattern with Jo-Ann's as with Michaels and Hobby Lobby.  Jo-Ann's was just purchased in the past few years by a venture capitalist, the same path Michaels took.

48.     Faherty has access to all of CPI's products, and CPI believes Faherty's intention is to direct import these products from China and undercut CPI's price drastically.  CPI believes it lost a recent Kid's Camp order for Jo-Ann's to someone going factory direct, most likely Faherty.  Faherty admitted she was selling products to Jo-Ann's.  Faherty also has sold Zhu's inflatables to Jo-Ann's.  The products in Jo-Ann's in spring 2015 will reveal whether others have sold CPI's products to Jo-Ann's.

49.     On information and belief, including Faherty also has been selling CPI's products to about selling CPI products to A.C. Moore.  Bill Maisch, a buyer for A.C. Moore, stated that he did not want to buy products from Faherty because they were CPI's original products, but eventually Faherty's prices were so low that he would not be making a good business decision if he didn't buy them from Faherty.  Maisch also stated that Faherty's products were being made by CPI's factory in China, which is Zhu's factory.

50.     Testing required on wood products imported into the United States is very expensive and a high cost item.  Zhu has informed CPI that Faherty was able to give better prices to A.C. Moore because she was using CPI's product test reports from Zhu's factory.  When these facts were discussed with Bill Maisch, he agreed to buy from CPI instead of Faherty, but only at reduced prices.

51.     In 2012, prior to the incident above with A.C. Moore and CPI's negotiation with Zhu regarding a possible partnership, CPI discovered at A.C. Moore a note taped to a group of "knock off" wood masks that said, "Hi Drew, these two Christmas masks were made in wrong size.  CPI quoted them same size as the attached skull (mask).  I have them making another set but didn't want to hold up the process.  Thanks, Michelle."  These three masks, the Frankenstein stand up and

the crisscross snowflake, were most definitely "knock offs" of CPI's original designs and products.  The Frankenstein stand up and the crisscross snowflake were in packaging which showed the factory as ZheJiang HongYe, the same factory as the previously discussed Hongye factory whose catalog is full of CPI's knocked off products and where CPI found many knocked off products in China in 2010.

52.     On information and belied, Plaid also has been a source of CPI's original designs and products sold at A.C. Moore stores.

53.     In October, 2011, A.C. Moore was purchased by Sbars who is one of the largest arts and crafts distributors in the United States.  The note attached to CPI's knocked off masks at A.C. Moore was addressed to Drew, a buyer for Sbars.  On information and belief, Faherty was selling CPI's knocked off products to Sbars and having them made at the Hongye factory as shown on the back of the product as well as selling CPI's knocked off products to A.C. Moore and having them manufactured at CPI's same factory.

54.     On December 14, 2014, Sbars website displayed many products which were "knock offs" or substantially similar to CPI's original designs or products.  For example, many wood alphabet fonts were sampled by Faherty when CPI had originated wood alphabet designs in the craft industry.  Today, the entire craft industry today is filled with wood alphabets.  Faherty admitted that CPI originated wood alphabets in the craft industry.

55.     Faherty also admitted she was working with Zhu and Kevin Xiao.  Moreover, in the recent meeting, Faherty never denied infringing CPI's original designs and products.

56.     After the recent meeting, CPI and Faherty traded a few phone calls and e-mails, some of which are attached hereto as Exhibit T.  CPI never heard back from Faherty, however, on the substance of any follow up with Zhu.

57.     In October 2014, CPI offered to sell products factory direct to Michaels.  Michaels was buying very little from CPI, even after many years of doing

COMPLAINT
Case No. _____

business with CPI and good relationships with Michaels buyers such as Mike Loveless, Bruce Miller and others including Eric Dickinson, who stated once that CPI's wood products "saved" Michaels' wood department.  CPI never sold Michaels wood alphabets, even though CPI's wood alphabets have been sold at Michaels.

58.　　Michaels was very interested in buying factory direct from CPI, and scheduled a meeting with 5 or 6 people including Girish Gulati, Michaels' Manager of Global Sourcing, Ami Hutchings, and a few others.  This was very unusual to have this many people in a sales presentation, especially since Michaels had not been interested in buying CPI's seasonal products in recent years.  At the meeting, Michaels was very excited to legally sell CPI's products again because they were a huge money maker for them.

59.　　When CPI asked Zhu for pricing, he gave higher prices than what he gives CPI for other customers.  In an e-mail, Zhu said, "can't you try and sell to some smaller companies."  On information and belief, Zhu did not want CPI to know that he was trying to sell CPI's original designs and products to Michaels through Faherty.

60.　　In a subsequently meeting, Michaels seemed very interested to buy CPI's dollar wood products factory direct for Halloween, Fall and other seasons for 2015.  For years, Michaels has sold seasonally CPI's masks, stand ups and many other products identical or substantially similar to CPI's designs, including in paper, foam, felt or material other than wood.  Traditionally, wood products sell much better than these other materials.  On information and belief, Michaels has for years been buying from Faherty these identical or substantially similar wood seasonal products (including masks and stand ups), and other identical or substantially similar products in different media other than wood, which Faherty has been selling to Michaels using various factories including the Hongye factory.

61.　　In approximately September 2014, CPI offered Christmas, Halloween and fall items to Hobby Lobby, who picked out for Christmas 26 of the 50 samples,

1   and approximately the same amount for Fall and Halloween.  Hobby Lobby was

2   excited CPI was showing them new designs and new products for sale factory direct.

3       62.    Hobby Lobby requested the actual samples of 26 of the 50 products for

4   Christmas and approximately the same amount for Fall and Halloween.  Ultimately,

5   CPI asked for the samples back, but the Hobby Lobby buyer Jessica Haynes claimed

6   she did not have them anymore.  On information and belief, Faherty undercut CPI

7   with Hobby Lobby like she did with Bill at A.C. Moore.  In fact, Faherty admitted

8   that she worked with Hobby Lobby each season to show them CPI's original wood

9   products, so that they could adapt or derive a slightly different design in an attempt

10   to call it their "own" product.

11       63.    Concerning Dollar Tree, on July 29, 2010 CPI received an e-mailed

12   response (Exhibit F at 1) to a notice of copyright infringement from John Deal,

13   Dollar Tree's Corporate Counsel, who stated (in part): "[W]e were unaware of any

14   intellectual property rights [but] [o]bviously we will not order this product again

15   from the vendor . . . ."  Since then, however, many infringing designs and products

16   have been sold in Dollar Tree stores, examples of which are shown in Exhibit F.

17       64.    Approximately 8 years ago, Faherty sent a picture of a charm program

18   that Plaid was selling, and many of the charms were substantially similar to what

19   CPI had previously sent her

20       65.    Over the past 10 years or so, CPI has paid invoices to the following

21   four companies as directed by Faherty: (a) between April 2007 and September 2010,

22   CPI paid $8,224,579 to Fuzhou Bomy Trading Company Ltd. (Import Genius shows

23   they were shipping to Plaid between January 2008 and March 2009); (b) between

24   June 2010 and November 2014, CPI paid $8,736,303 to Fuzhou Great Suns

25   Company Ltd. (Import Genius shows they frequently shipped to Plaid from

26   November 2010 and October 2012, and they also shipped to 99 Cent Only Stores

27   from February 2014 and June 2014); (c) between December 2002 and November

28   2007, CPI paid $369,038 to Fuzhou 4 Kids Company Manufacturing Ltd. (Import

COMPLAINT
Case No. _____

Genius shows shipments to Plaid also); (d) between January 2006 and March 2007, CPI paid $630,017 to Fujian Great H.Z.X. Import and Export Co.

## FIRST CLAIM FOR RELIEF

### (Copyright Infringement)

66.     Plaintiffs incorporate by this reference all of the allegations stated in the above paragraphs.

67.     By the acts of reproducing, distributing and/or selling "knock off" and/or substantially similar copies, or derivative works, of Plaintiffs' original designs and products, each Defendant has infringed Plaintiffs' exclusive rights in copyrighted works under 17 U.S.C. § 106, in violation of 17 U.S.C. § 501. Examples of the asserted infringement are depicted in the attached Exhibits A-H.

68.     The acts of copyright infringement asserted herein by each Defendant have been and continue to be deliberate and willful.

69.     Defendants have derived and received gains, profits and advantages from the aforesaid acts of infringement, and Plaintiffs have lost profits and have otherwise been damaged and are entitled to monetary relief in an amount to be determined at trial.

70.     Defendants' copyright infringement has caused and continues to cause irreparable harm, for which there is no adequate remedy at law, and the infringement will continue unless and until it is enjoined by this Court.

## SECOND CLAIM FOR RELIEF

### (False Designation of Origin)

71.     Plaintiffs incorporate by this reference all of the allegations stated in the above paragraphs.

72.     Through many years of consistent, creative effort, Plaintiffs have created numerous original designs and products that have proven to be very popular with consumers and successful at retail in the United States, including all of the designs and products depicted in Exhibits A-H.  Because of the popularity and

success of Plaintiffs' designs and products, the non-functional aspects of Plaintiffs' original designs and products has become distinctive; that is, the appearance of Plaintiffs' original designs indicates to consumers that the source and origin of these products is Plaintiffs, not competitors or others.

73.     Certain of the products sold by each Defendant in recent years—including but not limited to those shown in Exhibits A-H—are likely to cause confusion (and indeed, have caused confusion) among consumers concerning whether the products originated or are licensed or authorized or endorsed by Plaintiffs.  Examples of the asserted infringement are depicted in the attached Exhibits A-H.

74.     Defendants' false designations of origin have occurred in interstate commerce and have caused injury to Plaintiffs including loss of goodwill and diversion of sales that likely would have been acquired by Plaintiffs.

75.     Defendants' false designations of origin have caused Plaintiffs to suffer actual damages including lost profits, in an amount to be determined at trial, plus consequential damages.  Defendants' false designations also have resulted and continue to result in the unjust enrichment via profits to Defendants.

76.     Defendants have committed their acts of false designation willfully and maliciously to injure Plaintiffs' business and improve their own, thereby entitling Plaintiffs to an award of increased damages and attorney fees.

77.     Plaintiffs also have suffered and continue to suffer irreparable injury, including damage to its customer relationships because of the false designations. Such irreparable injury cannot be remedied adequately unless each Defendant is enjoined immediately from further false designations.

78.     Plaintiffs have no adequate remedy at law for the injuries they have suffered and continue to suffer, as it will be impossible for Plaintiffs to determine the precise amount of damage they will suffer if each Defendant's conduct is not restrained.

COMPLAINT
Case No. _____

### THIRD CLAIM FOR RELIEF

### (False Designation of Origin—California Law)

79.    Plaintiffs incorporate by this reference all of the allegations stated in the above paragraphs.

80.    By the acts alleged herein, each Defendant has violated Plaintiffs' rights under California law, including under Cal. Bus. & Prof. Code §§ 14330, 17500, and under the common law protections against trade dress infringement and palming off.

81.    Defendants have derived and received gains, profits and advantages from the aforesaid acts, and Plaintiffs have lost profits and have otherwise been damaged and are entitled to monetary relief in an amount to be determined at trial.

82.    Defendants have acted willfully and maliciously to injure Plaintiffs' business and improve their own, thereby entitling Plaintiffs to an award of exemplary damages and attorney fees.

83.    Defendants' violations of California law have caused and continue to cause irreparable harm, for which there is no adequate remedy at law, and the infringement will continue unless and until it is enjoined by this Court.

### FOURTH CLAIM FOR RELIEF

### (Intentional Interference With Prospective Economic Advantage)

84.    Plaintiffs incorporate by this reference all of the allegations stated in the above paragraphs.

85.    Defendants have been and are aware of Plaintiffs' many existing and prospective customer relationships, including with U.S. retailers selling crafts products.

86.    Through its acts manufacturing, distributing and/or selling Plaintiffs' original and/or substantially similar designs or products without authorization from Plaintiffs, each Defendant has intentionally interfered with Plaintiffs' existing and

COMPLAINT
Case No. _____

prospective business with these customers, and potentially others, by diverting business that likely would have been acquired by Plaintiffs.

87.     Each Defendant intended to interfere with Plaintiffs' prospective economic advantage, and each Defendant's intentional interference has caused Plaintiffs to suffer actual damages including lost profits, in an amount to be determined at trial, plus consequential damages.  Each Defendant's intentional interference with prospective economic advantage also has resulted and continues to result in its own unjust enrichment.

88.     Each Defendant has committed its acts of intentional interference with prospective economic advantage willfully and maliciously to injure Plaintiffs' business and improve its own, thereby entitling Plaintiffs to an award of exemplary damages and attorney fees.

## FIFTH CLAIM FOR RELIEF

### (Unfair Competition—Cal. Bus. & Prof. Code § 17200 *et seq.*)

89.     Plaintiffs incorporate by this reference all of the allegations stated in the above paragraphs.

90.     By its acts above constituting intentional interference with prospective economic advantage, each Defendant has employed unlawful and unfair business acts or practices, in violation of Cal. Bus. & Prof. Code § 17200 *et seq.*

91.     Each Defendant's unfair competition has resulted in and continues to result in unjust enrichment, and each Defendant has committed its acts of unfair competition willfully and maliciously to injure Plaintiffs' business and improve its own.

92.     Plaintiffs also have suffered and continue to suffer irreparable injury, including damage to customer relationships because of Defendants' unfair competition.  Such irreparable injury cannot be remedied adequately unless each Defendant is enjoined immediately from further unfair competition.

COMPLAINT
Case No. _____

## SIXTH CLAIM FOR RELIEF

### (Breach of Contract by Defendant Fuqing)

93.    Plaintiffs incorporate by this reference all of the allegations stated in the above paragraphs.

94.    In the Contribution Agreement entered February 11, 2014, Fuqing was obligated to pay to CPL (a) "a royalty of one percent (1%) of gross sales revenue billed and collected from any of its customers who purchased products manufactured using the license granted herein" (Section 1.6), and (b) "$100,000.00 on or before December 1, 2014" (Section 1.14).  Pursuant to Section 4 of the accompanying Consulting Agreement, Fuqing was obligated to pay CPI "a consulting fee of $100,000.00 . . . commencing on March 1, 2015, and on the 1st day of each year thereafter."

95.    Fuqing has paid no royalties to CPL, in material breach of the Contribution Agreement.

96.    Fuqing has failed to pay CPL the $100,000.00 due December 1, 2014, in material breach of the Contribution Agreement.

97.    Fuqing has failed to pay CPI the $100,000.00 due March 1, 2015, in material breach of the Consulting Agreement.

98.    The breaches of the Contribution Agreement and Consulting Agreement by Fuqing have caused Plaintiffs to suffer actual damages including lost profits, in an amount to be determined at trial, plus consequential damages including attorney fees and expenses, and also have resulted and continue to result in unjust enrichment to Fuqing.

99.    Plaintiffs also have suffered and continue to suffer irreparable injury, including damage to customer relationships because of the breaches, and such irreparable injury cannot be remedied adequately unless each Defendant is enjoined immediately from further breaches.

COMPLAINT
Case No. _____

## SEVENTH CLAIM FOR RELIEF

### (Breach of Contract by Defendants Zhu and Faherty)

100.   Plaintiffs incorporate by this reference all of the allegations stated in the above paragraphs.

101.   The June 16, 2012 Non-Disclosure Agreement signed by Zhu and Faherty (Exhibit J) states: "Recipient will not divulge to anyone [] information . . . related to [CPI's] concepts and/or products . . . ."  In the October 9, 2012 Non-Disclosure Agreement signed by Zhu and Faherty (Exhibit L), they agreed to "not disclose Confidential Information to any person, or permit any person to use or copy Confidential Information, for any purpose other than in connection with current discussions."

102.   Zhu and Faherty have breached these agreements by allowing other manufacturers and retailers to utilize, manufacture and sell Plaintiffs' proprietary and confidential original designs and products, to the damage and detriment of Plaintiffs.

103.   These breaches of the Non-Disclosure Agreements have caused Plaintiffs to suffer actual damages including lost profits, in an amount to be determined at trial, plus consequential damages including attorney fees and expenses, and also have resulted and continue to result in unjust enrichment to Zhu and Faherty.

104.   Plaintiffs also have suffered and continue to suffer irreparable injury, including damage to customer relationships because of the breaches, and such irreparable injury cannot be remedied adequately unless each Defendant is enjoined immediately from further breaches

## EIGHTH CLAIM FOR RELIEF

### (Fraud by Defendants Fuqing, Zhu, MRF and Faherty)

105.   Plaintiffs incorporate by this reference all of the allegations stated in the above paragraphs.

COMPLAINT
Case No. _____

106.   Defendants have made numerous false representations about their business, including at least the following: (a) Faherty represented that she was working on behalf of Plaintiffs; (b) Faherty and Zhu represented they were not working with Plaintiffs' competitors at the same time as for Plaintiffs with the same original designs and products; (c) Zhu actively changed the showrooms of his factories in an effort to conceal his manufacturing of "knock-off" and substantially similar products to Plaintiffs' original designs and products, and Faherty assisted in concealing the same.

107.   Each Defendant knew and was aware of the falsity of these representations.

108.   Plaintiffs had a belief in the truth of these false representations, in part, because Faherty represented herself as an experienced sales person who had relationships that could help Plaintiffs' business dealings.  Further, Zhu represented himself as a sophisticated manufacturer who worked with other successful companies.

109.   Each Defendant intended that its false representations would cause Plaintiffs to provide further original designs and products, so that Defendants could create and sell more "knock-offs" and substantially similar designs and products, and continue to enjoy further ill-gotten gains.

110.   Plaintiffs detrimentally relied on these representations because it continued to provide further original designs and products to Defendants.

111.   Defendants' misrepresentations have caused substantial damages to Plaintiffs.

## **PRAYER FOR RELIEF**

Therefore, Plaintiffs pray for the following relief:

A.   A determination that each Defendant has committed copyright infringement in violation of 17 U.S.C. § 501;

COMPLAINT
Case No. _____

B.      A determination that each Defendant has committed false designation of origin in violation of 15 U.S.C. § 1125, Cal. Bus. & Prof. Code §§ 14330 and 17500, and common law protections against trade dress infringement and palming off;

C.      A determination that each Defendant has intentionally interfered with Plaintiffs' prospective economic advantage;

D.      A determination that each Defendant has competed unfairly with Plaintiffs;

E.      A determination that Defendants Fuqing, Zhu and Faherty have breached their respective agreements with Plaintiffs;

F.      A determination that Defendants Fuqing, Zhu, MRF and Faherty have committed fraud;

G.      A determination that Defendants Fuqing, Zhu, MRF and Faherty have conspired to engage in copyright infringement, false designation of origin, intentional interference with prospective economic advantage, and unfair competition, in order to wrongfully compete with Plaintiffs in violation of the Racketeer Influenced and Corrupt Organization Act, including under 18 U.S.C. §§ 1961-68.

H.      A preliminary and permanent injunction against the continuing copyright infringement, false designation of origin, intentional interference with prospective economic advantage, unfair competition, and fraud, including under 17 U.S.C. §§ 502-03, and 15 U.S.C. § 1116;

I.      An accounting for damages, including Plaintiffs' lost profits, treble damages, pre-judgment and post-judgment interest, costs and attorney fees, including under 17 U.S.C. §§ 504-05 and 15 U.S.C. § 1117;

J.      A determination that each Defendant's illegal actions have been willful and deliberate, and that this is an exceptional case justifying an award of attorney

1   fees and expenses to Plaintiffs, including under 17 U.S.C. § 505 and 15 U.S.C. §

2   1117(a)(3);

3         K.     An accounting for damages adequate to compensate for the false

4   designation of origin and intentional interference with prospective economic

5   advantage, including Plaintiffs' lost profits and amounts attributable to each

6   Defendant's unjust enrichment, consequential damages, treble damages, exemplary

7   damages, attorney fees, pre-judgment and post-judgment interest, and costs; and

8         L.     Such other and further relief as this Court deems just and proper.

9              Respectfully submitted,

10  Dated:  April 1, 2015        **ONE LLP**

11

12             By:   /s/ Stephen M. Lobbin
               Attorneys for Plaintiff **Crafty**

13             **Productions, Inc.** and **Crafty**
               **Productions, LLC**

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT
Case No. _____