1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

CRAFTY PRODUCTIONS, INC., *et al.*,

                    Plaintiffs,

     v.

FUQING SANXING CRAFTS CO. LTD., *et al.*,

                  Defendants.

Case No. 15-cv-719-BAS(JLB)

**ORDER GRANTING DEFENDANTS' MOTIONS TO DISMISS FOR LACK OF PERSONAL JURISDICTION**

**[ECF Nos. 85, 88, 103, 104]**

Plaintiffs Crafty Productions, Inc. ("CPI") and Crafty Productions, LLC ("CPL") commenced this action against numerous defendants arising from allegations of copyright infringement of CPI's original craft designs and products. CPI and CPL (collectively, "Crafty") amended its complaint once with the operative complaint being the First Amended Complaint ("FAC"). (ECF No. 72.) Defendants Tony Zhu, Michelle Faherty d/b/a MRF Associates, Inc., A.C. Moore Arts & Crafts, Inc. ("A.C. Moore"), and Sbar's, Inc. ("Sbars") now separately move to dismiss for lack of personal jurisdiction. Crafty opposes all four motions.

The Court finds these motions suitable for determination on the papers submitted and without oral argument. *See* Civ. L.R. 7.1(d)(1). For the following reasons, the Court **GRANTS** Defendants' motions to dismiss.

# I.    BACKGROUND

CPI claims to be "a creative leader and trend-setter in the crafts industry, and has created many original product concepts and designs, including many creative, decorative wood products."[1] (FAC ¶ 22.) Its annual U.S. sales in 2009 topped $7 million, but by 2014, its annual U.S. sales had fallen to "barely $2 million, with much smaller profit margins because of the price competition resulting from intellectual property infringement and 'factory direct' sales from China." (*Id.* ¶ 23.)

Sometime in 1995, CPI hired Ms. Faherty as a sales representative. (FAC ¶ 24.) After providing samples of CPI's products for a manufacturing cost estimate, CPI began using a Chinese manufacturer owned by Kevin Xiao and/or Mr. Zhu for cost-saving purposes. (*Id.*)

Between 2002 and 2012, CPI sent Ms. Faherty "almost all of its products and designs (approximately 10,000 or more) to have samples made and priced by manufacturers in Asia." (FAC ¶ 25.) Crafty alleges that CPI later learned Ms. Faherty was "acting as a 'middle man' between CPI and factories owned (at least partially) by Zhu[.]" (*Id.*) But in 2012, Mr. Zhu allegedly informed CPI that Ms. Faherty "no longer worked with him and had left his organization and started another company." (*Id.*)

CPI later became aware of unauthorized infringing replicas of its product line produced by Zhejiang Hongye Art & Craft Co., Ltd. ("Hongye") in China being shipped to Michaels and Plaid. (FAC ¶¶ 26-27.) According to Crafty, "[m]any of the products were exact or substantially similar replicas of CPI's original designs and products," but it "had never heard of Hongye, and it was not one of CPI's past or then-current manufacturers." (*Id.*)

In 2010, Ms. Faherty arranged a visit to the Hongye factory and Mr. Zhu's Fuzhou factory in China. (FAC ¶¶ 28-29.) CPI was only permitted to see Hongye's

---

[1] CPI's founder, owner, and president is Paula Mello; CPI is a majority owner of CPL. (FAC ¶ 4.)

showroom rather than any manufacturing activity, where "there was an entire layout of many of CPI's original designs and products" with no apparent "effort by the manufacturer to disguise the fact that they were producing unauthorized CPI products." (*Id.*) In contrast, CPI toured the Fuzhou factory, and though the showroom had CPI products as well, "[t]he Hongye factory showroom . . . had significantly more of CPI's products in their factory[.]" (*Id.* ¶ 29.) While at the Fuzhou factory, CPI also noticed a "frame that was substantially similar to one of CPI's designs" with "Plaid" branding; Plaid allegedly supplies products to Walmart, Hobby Lobby, Michaels, and others. (*Id.* ¶ 30.) After noting the Plaid reference, Ms. Faherty allegedly stated, "In the past we have worked with some of your competitors, but we are in partnership with you and we will produce only for you." (*Id.*) Crafty speculates that "Faherty and Zhu had cleared out all of CPI's products being manufactured for competitors for purposes of the visit, but accidentally left one frame behind." (*Id.*)

Crafty alleges that "for many years, Faherty and Zhu have been enabling the manufacture in China of products that are 'knock offs' or substantially similar to CPI's original designs and products, for sale to Plaid and others for ultimate retail sale in the United States and elsewhere." (FAC ¶ 33.) Around May 2012, CPI reminded Ms. Faherty "that she was not authorized to manufacture or sell any original CPI designs or products to anyone but CPI or its customers." (*Id.* ¶ 35.) "In response, Faherty stated that as long as she and Zhu were partners, they would not sell to CPI's competitors." (*Id.*) Crafty alleges that Ms. Faherty, Mr. Zhu, and Mr. Xiao also "signed a non-disclosure agreement concerning CPI's proprietary and/or confidential information." (*Id.*)

Despite its inquiries and investigation, Crafty alleges that infringement of its intellectual property continued. (FAC ¶¶ 36-37, 44-65.) The perceived negative impact of the infringement on CPI's business prompted it to pursue potential buyers of the company in China, starting with Mr. Zhu. (*Id.* ¶ 37.)

//

In October 2012, CPI, Ms. Faherty, Mr. Zhu, and Mr. Xiao entered into preliminary negotiations for the sale of CPI. (FAC ¶ 38.) Mr. Zhu eventually made a written offer to purchase CPI for $2 million, but he ultimately backed out of his offer. (*Id.* ¶ 39.)

By early 2014, CPI reached a series of agreements with Mr. Zhu, including a February 11, 2014 Contribution Agreement whereby Mr. Zhu's company, Fuqing Sanxing Crafts Co. Ltd. ("Fuqing"), "agreed to purchase a 33% ownership interest in CPL." (FAC ¶ 40.) Crafty alleges that Fuqing agreed to: (1) contribute $100,000 to CPL before December 1, 2014; and (2) "provide a quarterly sales report to CPL, listing all sales of products sold under the non-exclusive license[.]" (*Id.*) Crafty also alleges that under the Consulting Agreement, Fuqing was required to pay "a consulting fee of $100,000.00 . . . commencing on March 1, 2015, and on the 1st day of each year thereafter." (*Id.*) However, according to Crafty, none of these obligations have been met. (*See id.*)

Later that same year, on November 6, 2014, Ms. Faherty met with Ms. Mello to allegedly express that "she thought Mello thought she did things that she never did, such as the Hongye factory." (FAC ¶ 42.) In response, Crafty alleges that Ms. Mello reminded Ms. Faherty that

> (a) competitors had tons of products that were "knock offs" or substantially similar to CPI's original designs and products, (b) Faherty had access to all of CPI's artwork to take to China as a "middle man" to have samples made, (c) CPI had paid close to $18,000,000.00 to factories that Faherty was associated with over the years.

(*Id.*) Crafty opines that "[t]he only way the Hongye factory could have gotten CPI's products was if a retail buyer or Faherty or someone else brought CPI's designs to the Hongye factory." (FAC ¶ 43.) It suspects that buyers and Ms. Faherty had provided the designs because (1) Ms. Faherty allegedly "stated previously that buyers often give samples to the factories, and/or factory representatives come to the U.S. to buy products and bring them back to China; and (2) "[t]here were CPI items in the

Hongye factory . . . that were never sold and had only been given to Faherty and buyers, which means those products could only have reached China via Faherty or one of the retail buyers in the U.S." (*Id.*)

On April 1, 2015, Crafty commenced this action against Fuqing, Mr. Zhu, Ms. Faherty, MRF Associates, Inc., and numerous retailers. Crafty amended the complaint once as a matter of course with the operative complaint being the FAC. In the FAC, Crafty asserts eights claims for: (1) Copyright Infringement; (2) False Designation of Origin; (3) False Designation of Origin—California law; (4) Intentional Interference with Prospective Economic Advantage; (5) Unfair Competition under California Business & Professions Code § 17200; (6) Breach of Contract against Fuqing; (7) Breach of Contract against Mr. Zhu and Ms. Faherty; and (8) Fraud against Fuqing, Mr. Zhu, MRF Associates, and Ms. Faherty.

Mr. Zhu, Ms. Faherty, A.C. Moore, and Sbars now separately move to dismiss for lack of personal jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(2). A.C. Moore and Sbars also alternatively move to dismiss under Rule 12(b)(3) for improper venue. Crafty opposes all four motions.

## II.   LEGAL STANDARD

A federal court may only exercise personal jurisdiction where such jurisdiction satisfies both the forum state's long-arm statute and constitutional principles of due process. *See Lee v. City of Los Angeles*, 250 F.3d 668, 692 (9th Cir. 2001). Here, California's long-arm statute permits the exercise of jurisdiction to the fullest extent permitted by the U.S. Constitution. *See* Cal. Civ. Proc. Code § 410.10 ("[A] court of this state may exercise jurisdiction on any basis not inconsistent with the Constitution of this state or of the United States.") Thus, in this case, the jurisdictional analyses under state and federal law are the same, and the inquiry centers on whether the exercise of personal jurisdiction comports with federal due process. *Picot v. Weston*, 780 F.3d 1206, 1211 (9th Cir. 2015) (citation omitted).

For a court to exercise personal jurisdiction over a defendant consistent with due process, that defendant must have sufficient "minimum contacts" with the forum state "such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (quoting *Milliken v. Meyer*, 311 U.S. 457, 463 (1940)). In assessing minimum contacts, the Supreme Court has emphasized that "the defendant's conduct and connection with the forum State" must be such that the defendant "should reasonably anticipate being haled into court there." *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980). The personal jurisdiction requirement thus protects an individual's liberty interest "in not being subject to the binding judgments of a forum with which he has established no meaningful 'contacts, ties, or relations.'" *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985) (quoting *Int'l Shoe Co.*, 326 U.S. at 319). The nature and quality of contacts necessary to support personal jurisdiction depend upon whether the plaintiff asserts general or specific jurisdiction against the defendant. *See Picot*, 780 F.3d at 1211; *Nutrishare, Inc. v. BioRX, L.L.C.*, No. CIV. S-08-1252 WBS EFB, 2008 WL 3842946, at *2 (E.D. Cal. Aug. 14, 2008).

Under Federal Rule of Civil Procedure 12(b)(2), a defendant may move to dismiss a complaint for lack of personal jurisdiction. In opposing a Rule 12(b)(2) motion, the plaintiff bears the burden of establishing that jurisdiction is proper. *Boschetto v. Hansing*, 539 F.3d 1011, 1015 (9th Cir. 2008). Where, as here, the court considers the motion without holding an evidentiary hearing, "the plaintiff need only make a prima facie showing of jurisdictional facts to withstand the motion to dismiss." *Mavrix Photo, Inc. v. Brand Tech., Inc.*, 647 F.3d 1218, 1223 (9th Cir. 2011) (quoting *Brayton Purcell LLP v. Recordon & Recordon*, 606 F.3d 1124, 1127 (9th Cir. 2010)). In other words, "the plaintiff need only demonstrate facts that if true would support jurisdiction over the defendant." *Ballard v. Savage*, 65 F.3d 1495, 1498 (9th Cir. 1995).

//

In resolving a Rule 12(b)(2) motion, the court may consider evidence outside the pleadings, including affidavits and other materials submitted on the motion. *See Daimler AG v. Bauman*, 571 U.S. —, 134 S. Ct. 746, 752 (2014) (noting that plaintiffs opposing the motion to dismiss for lack of personal jurisdiction submitted declarations and exhibits purporting to demonstrate defendant's contacts in the forum state); *Doe v. Unocal Corp.*, 248 F.3d 915, 922 (9th Cir. 2001). "The plaintiff cannot 'simply rest on the bare allegations of the complaint,' but uncontroverted allegations in the complaint must be taken as true." *Mavrix Photo*, 647 F.3d at 1223 (quoting *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 800 (9th Cir. 2004) (quotation omitted)). Furthermore, while the court may not assume the truth of allegations that are contradicted by affidavits, *Mavrix Photo*, 647 F.3d at 1223, the court draws all reasonable inferences from the complaint, and resolves all factual disputes, in favor of the plaintiff. *Fiore v. Walden*, 688 F.3d 558, 575 (9th Cir. 2012) ("We will draw reasonable inferences from the complaint in favor of the plaintiff where personal jurisdiction is at stake, and will assume credibility."), *rev'd on other grounds*, 571 U.S. —, 134 S. Ct. 1115 (2014); *Pebble Beach Co. v. Caddy*, 453 F.3d 1151, 1154 (9th Cir. 2006); *see also Miracle v. N.Y.P. Holdings, Inc.*, 87 F. Supp. 1060, 1063 (D. Haw. 2000) ("Once the defendant moves to dismiss and presents evidence disputing personal jurisdiction, the burden shifts to the plaintiff to make a prima facie showing via admissible evidence that personal jurisdiction exists.").

## III.   DISCUSSION

Mr. Zhu, Ms. Faherty, A.C. Moore, and Sbars argue that dismissal is appropriate for the lack of personal jurisdiction under Rule 12(b)(2). A.C. Moore and Sbars add that dismissal is also appropriate for improper venue under Rule 12(b)(3). Crafty opposes primarily on the grounds that it satisfies its burden in establishing specific jurisdiction.

//

### A.    General Jurisdiction

General jurisdiction allows a court to hear any and all claims against a defendant regardless of whether the claims relate to the defendant's contacts with the forum state. *See Schwarzenegger*, 374 F.3d at 801 ("[A] finding of general jurisdiction permits a defendant to be haled into court in the forum state to answer for any of its activities in the world."). For general jurisdiction to exist, a defendant's affiliations with the forum state must be "so 'continuous and systematic' as to render them essentially at home in the forum[.]" *Daimler*, 134 S. Ct. at 751 (quoting *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011)). In the case of a corporation, "[t]he paradigmatic locations where general jurisdiction is appropriate . . . are its place of incorporation and its principal place of business." *Ranza v. Nike, Inc.*, 793 F.3d 1059, 1069 (9th Cir. 2015) (citing *Daimler*, 134 S. Ct. at 760). "Only in an 'exceptional case' will general jurisdiction be available anywhere else." *Martinez v. Aero Caribbean*, 764 F.3d 1062, 1070 (9th Cir. 2014) (quoting *Daimler*, 134 S. Ct. at 761 n.19).

### 1.    A.C. Moore and Sbars

Neither A.C. Moore nor Sbars are incorporated in California or have California as their principal place of business. (*See* Brunozzi Decl. ¶ 2; Scappa Decl. ¶ 2.) Crafty nonetheless argues that "given the size of these companies, the fact that both A.C. Moore and Sbars have an online presence offering to sell products to California customers should satisfy Plaintiffs' *prima facie* burden on jurisdiction." (Crafty's A.C. Moore Opp'n 6:2-4; *see also* Lobbin Decl. Ex. 8.) However, Crafty is mistaken. A company's size alone does not justify the exercise of general jurisdiction. *See Daimler*, 134 S. Ct. at 760; *Ranza*, 793 F.3d at 1069. Reference to a company's size also fails to demonstrate that this is an exceptional case warranting venturing outside the traditional bases of general jurisdiction for corporations. *See Martinez*, 764 F.3d at 1070.

A.C. Moore and Sbars submit declarations that they have virtually no presence in California. (*See* Brunozzi Decl. ¶¶ 2-14; Scappa Decl. ¶¶ 2-15.) For example, among other things, both companies state that they have not sold, shipped, or advertised any of Crafty's products in California. (Brunozzi Decl. ¶ 5; Scappa Decl. ¶¶ 5-6.) Both also are not registered in California as foreign corporations, do not own or lease property in California, and do not pay taxes in California. (Brunozzi Decl. ¶¶ 6-7, 11, 13; Scappa Decl. ¶ 9-10, 13, 15.) Crafty fails to submit any evidence to dispute these facts.

A.C. Moore and Sbars concede that they maintain websites. (Brunozzi Decl. ¶ 10; Scappa Decl. ¶ 8.) But A.C. Moore's website does not sell merchandise and "[a]t no time did the . . . website ever list, advertise, sell, or offer to sell the accused Products."[2] (Brunozzi Decl. ¶ 10.) It only sells gift cards. (Mello Decl. Ex. 5.) Similarly, Sbars' website "is directed toward retailers, not individual consumers," and it "does not display the Accused Products" and "[n]o purchases of the Accused Products were made through the Sbars website." (Scappa Decl. ¶ 8.) The only attempt to dispute Sbars' evidence appears to be a screenshot of the Sbars website for a wood-mask product, which fails to contradict any of Sbars' assertions that the website is not directed at California consumers. (*See* Mello Decl. Ex. 4.) Ultimately, the mere maintenance of an interactive website, such as A.C. Moore's and Sbars' websites, is insufficient to support general jurisdiction over a foreign defendant, even if residents of the forum state visit the website *and* make purchases through it. *See CollegeSource, Inc. v. AcademyOne, Inc.*, 653 F.3d 1066, 1075-76 (9th Cir. 2011) ("If the maintenance of an interactive website were sufficient to support general jurisdiction in every forum in which users interacted with the website, 'the eventual demise of all restrictions on the personal jurisdiction of state courts' would be the inevitable result.").

---

[2] "Accused Products" refers to products alleged to infringe on Crafty's copyrights and trade dress. (Brunozzi Decl. ¶ 3.)

Without more, Crafty fails to carry its burden showing A.C. Moore and Sbars are "essentially at home in the forum[.]" *See Daimler*, 134 S. Ct. at 751. Consequently, the Court cannot exercise general jurisdiction over A.C. Moore and Sbars. *See id.*

## 2.    Mr. Zhu

With respect to Mr. Zhu, Crafty states that "Zhu may not be subject to general jurisdiction ***yet***, but inevitably he will be required to appear in California for a deposition, and if necessary he will be served with process personally at that time." (Crafty's Zhu Opp'n 6:18-7:2.) Crafty adds that "***Zhu indeed has consented*** to being a party-defendant in this action, thereby waiving any challenge to personal jurisdiction." (*Id.*)

The Court interprets the former statement as Crafty's concession that there is no general jurisdiction as to Mr. Zhu, at least at this time.

Regarding the latter, Mr. Zhu contends that Crafty "mischaracterize[s] an exchange between counsel in arguing that Mr. Zhu consented to personal jurisdiction in this action." (Zhu's Reply 2:9-3:20.) Crafty's counsel, Stephen M. Lobbin, describes the exchange as follows:

> Counsel for Fuqing and Zhu—Mr. Tony Liu—contacted me in August to discuss Zhu's desire to delay the necessity to travel to California for the noticed deposition. We discussed this issue by telephone several times, including on September 7, 2015 when I agreed to continue the deposition to a future date agreeable to all parties, in exchange for Zhu's agreement that he would appear and participate as a named Defendant in this action, which relieved Plaintiffs of one of the objects of the deposition, which was to confirm Zhu's participation in the case by serving him with process personally in California, if necessary to confirm personal jurisdiction. Zhu's counsel agreed to my proposal, and confirmed our agreement in an e-mail the next day, a true and correct copy of which is attached hereto as Exhibit 7.

(Lobbin Decl. ¶ 7.) After examining the email attached as Exhibit 7 to Mr. Lobbin's declaration, the Court agrees with Mr. Zhu that Crafty mischaracterizes the prior discussion.

Mr. Zhu's counsel states in the September 7, 2015 email to Mr. Lobbin that "Tony Zhu will appear in this action, so per our phone discussion, you will just oppose my motion to compel arbitration and take his deposition off calendar." (Lobbin Decl. Ex. 7.) He continues, "So to clarify, his deposition will be taken based on the schedule workable for all parties, I will do the same for CPL/CPI/Paula Mello's depositions, since she will also be the key witness in this case." (*Id.*) There is no mention of jurisdiction in the email. There certainly is no explicit statement regarding consenting to jurisdiction. And Crafty fails to provide any legal authority supporting the idea that an appearance is tantamount to consenting to jurisdiction.

Lastly, Crafty also suggests Mr. Zhu consented to jurisdiction as a result of certain agreements. (Crafty's Zhu Opp'n 3:8-13.) "[P]arties to a contract may agree in advance to submit to the jurisdiction of a given court." *Nat'l Equip. Rental, Ltd. v. Szukhent*, 375 U.S. 311, 316 (1964). But only one of the agreements referenced includes a provision regarding venue and jurisdiction. (*See* FAC Ex. O.) More importantly, Mr. Zhu apparently signed each of the agreements referenced in his capacity as an officer of Fuqing and not in his individual capacity. (*See* FAC Exs. L, N-Q.) Consequently, without more, Crafty fails to justify construing the provisions of any of these agreements against Mr. Zhu individually.

### 3.   Ms. Faherty

Crafty concedes that Ms. Faherty is not subject to this Court's general jurisdiction. (Crafty's Faherty Opp'n 5:14-16.)

//

//

//

15cv719

## B.    Specific Jurisdiction

"The inquiry whether a forum State may assert specific jurisdiction over a nonresident defendant 'focuses on the relationship among the defendant, the forum, and the litigation.'" *Walden v. Fiore*, 571 U.S. —, 134 S. Ct. 1115, 1121 (2014) (quoting *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 775 (1984) (internal quotation omitted)). For specific jurisdiction to exist, "the defendant's suit-related conduct must create a substantial connection with the forum State." *Id.* at 1121; *see also Nissan Motor Co. Ltd. v. Nissan Comput. Corp.*, 89 F. Supp. 2d 1154, 1158 (C.D. Cal. 2000) ("Specific personal jurisdiction may be exercised when the nature and quality of the defendant's contacts with the forum state are significant in relation to the specific cause of action.") (internal quotation and citation omitted). This connection "must arise out of contacts that the 'defendant *himself*' creates with the forum State." *Walden*, 571 U.S. —, 134 S. Ct. at 1122 (quoting *Burger King*, 471 U.S. at 475). A defendant's affiliation with the plaintiff, or with persons who reside in the forum, standing alone, is insufficient to confer specific jurisdiction. *Id.* at 1122–23.

The Ninth Circuit employs a three-prong test to assess whether a defendant's contacts with the forum state are sufficient to subject it to specific jurisdiction:

> (1) The non-resident defendant must purposefully direct his activities or consummate some transaction with the forum or resident thereof; or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws;
>
> (2) the claim must be one which arises out of or relates to the defendant's forum-related activities; and
>
> (3) the exercise of jurisdiction must comport with fair play and substantial justice, i.e., it must be reasonable.

*Picot*, 780 F.3d at 1211 (citing *Schwarzenegger*, 374 F.3d at 802).

//

The plaintiff bears the burden of satisfying the first two prongs of this specific-jurisdiction test. *Schwarzenegger*, 374 F.3d at 802. "If the plaintiff succeeds in satisfying both of the first two prongs, the burden then shifts to the defendant to 'present a compelling case' that the exercise of jurisdiction would not be reasonable." *Id.* "If any of the three requirements is not satisfied, jurisdiction in the forum would deprive the defendant of due process of law." *Pebble Beach*, 453 F.3d at 1155.

### 1.    Purposeful Direction

"The first prong of the specific jurisdiction test refers to both purposeful direction and purposeful availment." *Mavrix Photo*, 647 F.3d at 1228. In cases involving tortious conduct, courts generally employ a purposeful-direction analysis. *Id.* (citing *Schwarzenegger*, 374 F.3d at 802). "In tort cases, [courts] typically inquire whether a defendant 'purposefully direct[s] his activities' at the forum state, applying an 'effects' test that focuses on the forum in which the defendant's actions were felt, whether or not the actions themselves occurred within the forum." *Yahoo! Inc. v. La Ligue Contre Le Racisme*, 433 F.3d 1199, 1206 (9th Cir. 2006) (en banc). Under this test, which derives from the Supreme Court's decision in *Calder v. Jones*, 465 U.S. 783 (1984), "the defendant allegedly must have (1) committed an intentional act, (2) expressly aimed at the forum state, (3) causing harm that the defendant knows is likely to be suffered in the forum state." *CollegeSource*, 653 F.3d at 1077 (internal quotation marks omitted).

The Ninth Circuit has emphasized that express aiming requires "something more" than "a foreign act with foreseeable effects in the forum state." *Washington Shoe Co. v. A-Z Sporting Goods, Inc.*, 704 F.3d 668, 675 (9th Cir. 2012) (quoting *Bancroft & Masters, Inc. v. Augusta Nat'l Inc.*, 223 F.3d 1082, 1087 (9th Cir. 2000)). *But see Erickson v. Neb. Machinery Co.*, No. 15-cv-02247-JD, 2015 WL 4089849, at *3-4 (N.D. Cal. July 6, 2015) (concluding "that *Walden* overrides *Washington Shoe* generally" and the idea "that a defendant's knowledge of a plaintiff's forum

– 13 –

15cv719

connections and the foreseeability of harm there are enough in themselves to satisfy the minimum contacts analysis"); *see also Adobe Sys. Inc. v. Cardinal Camera & Video Ctr, Inc.*, No. 15-cv-02991-JST, 2015 WL 5834135, at *3-4 (N.D. Cal. Oct. 7, 2015). In assessing whether a defendant has done "something more," courts consider several factors, including "the interactivity of the defendant's website, the geographic scope of the defendant's commercial ambitions, and whether the defendant 'individually targeted' a plaintiff known to be a forum resident." *Mavrix Photo*, 647 F.3d at 1229 (citation omitted). Express aiming can be shown where a corporation "continuously and deliberately" exploits the forum state's market for its own commercial gain. *Id.* at 1229-30 (citing *Keeton*, 465 U.S. at 773-74, 781).

Because copyright infringement sounds in tort, the purposeful-direction analysis is appropriate here. *See Mavrix Photo*, 647 F.3d at 1228 ("Because Mavrix has alleged copyright infringement, a tort-like cause of action, purposeful direction 'is the proper analytical framework.'"); *IO Group, Inc. v. Pivotal, Inc.*, No. C 03-5286 MHP, 2004 WL 838164, at *5 (N.D. Cal. Apr. 19, 2004) ("Copyright infringement may be characterized as an intentional tort.").

### a.    A.C. Moore and Sbars

Crafty presents three facts it contends support the determination that A.C. Moore and Sbars are subject to specific jurisdiction: (1) both "operate active, not passive, websites that offer to sell products continuously to California residents"; (2) "both A.C. Moore and Sbars are big companies, big players in the market segment at issue, and have national and international ambitions"; and (3) "the allegations in this action make clear that these Defendants knew that their alleged infringing actions would have a targeted impact on Plaintiffs in this forum, and therefore it was completely foreseeable that they would be haled into this Court." (Crafty's A.C. Moore Opp'n 6:17-7:7.) Crafty fails to specifically direct the Court to where in the record these facts can be found, and the Court, too, was unable to locate these precise

facts in the FAC or evidence submitted. However, even if the Court assumes that these facts were alleged in the FAC, it cannot conclude that A.C. Moore's and Sbars' alleged wrongful conduct was expressly aimed at California.

A.C. Moore submits evidence that it has not "sold, offered to sell, distributed, shipped, or advertised the Accused Products in or to California." (Brunozzi Decl. ¶ 5.) And as previously discussed, it also submits evidence that though A.C. Moore operated an interactive, but passive website, the "website does not sell merchandise," and as such, the website never "list[ed], advertise[d], [sold], or offer[ed] to sell the accused Products." (*Id.* ¶ 10.) Crafty only submits evidence that A.C. Moore may have possessed allegedly infringing products at some point in 2012 (FAC Ex. D), but there is no evidence that Crafty clearly identifies suggesting that A.C. Moore expressly aimed any of these allegedly infringing products to California. The only evidence of products potentially sold in California are gift cards sold on the website, which, to state the obvious, are not infringing craft products. (*See* Mello Decl. Ex. 5.)

Similarly, Sbars submits evidence that it "did not[] distribute, sell, or ship Accused Products to any consumers or retailers located in California," or advertise or purchase any of the Accused Products in California. (Scappa Decl. ¶¶ 5-8.) Sbars does own and operate a website, but it is not directed at individual consumers, and "[a]s such, to purchase merchandise from the Sbars website a retailer must have an account with Sbars." (Scappa Decl. ¶ 8.) More importantly, Sbars' evidence emphasizes that its "website does not display the Accused Products" and "[n]o purchases of the Accused Products were made through the Sbars website." (*Id.*) Again, Crafty only submits evidence that Sbars may have possessed allegedly infringing products at some point, possibly even on the website (FAC Ex. D), but there is no evidence that Crafty clearly identifies suggesting Sbars expressly aimed any of these allegedly infringing product to California. Crafty submits a screenshot of Sbars' website with an allegedly infringing product available for purchase (Mello

Decl. Ex. 4), but that does not contradict Sbars' position that it has not sold merchandise to individual consumers in California.

The conclusory assertion that A.C. Moore and Sbars are "big companies, big players in the market segment at issue, and have national and international ambitions" also fails to persuade the Court that the two companies have commercial ambitions relevant to the express-aiming analysis. *See Mavrix Photo*, 647 F.3d at 1229. Crafty also fails to identify facts suggesting that A.C. Moore and Sbars individually targeted Crafty through the alleged tortious conduct or even knew Crafty was a California resident. *See id.*

A.C. Moore and Sbars are companies that may have possessed allegedly infringing products at some point, even displaying some on their respective websites. Crafty relies on bare allegations in the FAC, failing to dispute evidence presented by A.C. Moore and Sbars with evidence of its own. *See Mavrix Photo*, 647 F.3d at 1223. The Court cannot assume the truth of Crafty's allegations contradicted by A.C. Moore's and Sbars' evidence. *See id.* The facts before the Court, mostly from A.C. Moore's and Sbars' undisputed evidence, do not suggest that either expressly aimed their allegedly tortious conduct at California. *See Mavrix Photo*, 647 F.3d at 1229. Consequently, Crafty fails to satisfy the purposeful-direction prong of the specific-jurisdiction analysis, ending the jurisdictional inquiry. *See Schwarzenegger*, 374 F.3d at 802. Therefore, the Court cannot exercise specific jurisdiction over A.C. Moore and Sbars. *See id.*

### b.     Mr. Zhu

Relying heavily on Ms. Mello's declaration, Crafty lists numerous facts it contends support exercising specific jurisdiction over Mr. Zhu: (1) "Zhu interacted with CPI for more than 10 years and for more than $16,000.000.00 in legitimate business, manufacturing CPI's original designs and products for sale by CPI to its customers"; (2) Mr. Zhu "authorized all of the infringing sales to other U.S.

1   customers (including 99 Cents Only Stores in Los Angeles)"; (3) Mr. Zhu

2   "authorized Fuqing's lawsuit filed in San Diego"; and (4) Mr. Zhu "signed off at least

3   five times on California as the place for dispute resolution and/or California law

4   governing any dispute in various agreements involving CPI." (Crafty's Zhu Opp'n

5   7:18-8:15.) Crafty strongly suggests that Mr. Zhu's acquisition of the infringing

6   designs and products is the wrongful conduct that subjects him to this Court's specific

7   jurisdiction. However, Crafty, once again, fails to demonstrate specific jurisdiction.

8       Most of the facts described are not relevant to determining whether this Court

9   can exercise specific jurisdiction over Mr. Zhu. With respect to Crafty's copyright-

10   infringement and other tort-based claims, Mr. Zhu's past *legitimate* business is

11   irrelevant in determining specific jurisdiction as the subject of this action is alleged

12   *illegitimate* business. *See Nissan Motor*, 89 F. Supp. 2d at 1158 ("Specific personal

13   jurisdiction may be exercised when the nature and quality of the defendant's contacts

14   with the forum state are significant in relation to the specific cause of action.").

15       The only relevant, albeit conclusory, fact is Mr. Zhu's purported authorization

16   of infringing sales in the California. But that fact holds little weight as it is merely a

17   conclusory statement. More importantly, that fact cannot be found in the FAC, Ms.

18   Mello's declaration, or any other source the Court may properly consider. The closest

19   allegation in the FAC is the assertion that "[u]pon information and belief, for many

20   years, Faherty and Zhu have been enabling the manufacture in China of products that

21   are 'knock offs' or substantially similar to CPI's original designs and products, for

22   sale to Plaid and others for ultimate retail sale in the United States and elsewhere."

23   (FAC ¶ 33.) However, even that allegation does not suggest Mr. Zhu expressly aimed

24   any wrongful conduct *at* California. *See Yahoo!*, 433 F.3d at 1206.

25       The facts provided in the FAC and elsewhere in this action make it clear that

26   Crafty believes Mr. Zhu is one of the primary sources of leaked intellectual property.

27   But Crafty fails to provide, or at least direct this Court to, any facts in the FAC or

28   evidence suggesting that Mr. Zhu expressly aimed any alleged copyright

infringement or other tortious conduct at California. *See Mavrix Photo*, 647 F.3d at 1229. Consequently, Crafty fails to satisfy the purposeful-direction prong of the specific-jurisdiction analysis with respect to Mr. Zhu. *See Schwarzenegger*, 374 F.3d at 802.

### c.    Ms. Faherty

Crafty essentially asserts the same grounds for exercising specific jurisdiction over Ms. Faherty as it did with Mr. Zhu, emphasizing past legitimate business not at issue in this action. (Crafty's Faherty Opp'n 5:14-9:8.) It also suggests that Ms. Faherty sold infringing products in California, but without any factual support in the FAC or evidence submitted. (*Id.*) For the same reasons the Court was unpersuaded by these arguments for Mr. Zhu, the Court is also unpersuaded that these considerations confer specific jurisdiction over Ms. Faherty.

Crafty does submit various purchase orders between 99 Cents Only Stores and Fuzhou Great Suns Co. Ltd. with Ms. Faherty listed as the vendor contact and the invoice location being Los Angeles, CA, but it is unclear whether the products listed in these purchase orders are infringing products, or are somehow otherwise related to the tortious conduct alleged in this action. (*See* Mello Decl. Ex. 3.) Instead, Ms. Mello only describes these documents as ones "confirming that Faherty and Zhu and his companies have done substantial business with 99 Cents Only Stores in Los Angeles." (Mello Decl. ¶ 8.) Thus, though these purchase orders appeared to at least link Ms. Faherty to California, they also fail to demonstrate that she expressly aimed any alleged copyright infringement or other tortious conduct at California. *See Mavrix Photo*, 647 F.3d at 1229.

There may very well be facts available to establish purposeful direction, but such facts are either not alleged or could not be found in the voluminous convoluted allegations in the FAC. As a result, Crafty ultimately also fails to carry its burden and satisfy the purposeful-direction prong of the specific-jurisdiction analysis with

respect to Ms. Faherty. *See Schwarzenegger*, 374 F.3d at 802.

### 2.      Purposeful Availment

For cases sounding in contract, courts generally apply the purposeful-availment analysis. *Schwarzenegger*, 374 F.3d at 802. "An out-of-state party does not purposefully avail itself of a forum merely by entering into a contract with a forum resident." *HK China Grp., Inc. v. Beijing United Auto & Motorcycle Mfg. Corp.*, 417 F. App'x 664, 665 (9th Cir. 2011) (citing *Burger King*, 471 U.S. at 478); *see also Roth v. Garcia Marquez*, 942 F.2d 617, 621 (9th Cir. 1991) ("[T]he existence of a contract with a resident of the forum state is insufficient by itself to create personal jurisdiction over the nonresident."). "Rather, there must be actions by the defendant himself that create a 'substantial connection' with the forum State." *Picot*, 780 F.3d at 1212 (internal quotation marks and emphasis omitted). Merely "random, fortuitous, or attenuated" contacts are not sufficient. *Burger King*, 471 U.S. at 475 (internal quotation marks omitted).

When the exercise of personal jurisdiction over a defendant is based on the execution or performance of a contract, the court must "use a highly realistic approach that recognizes that a contract is ordinarily but an intermediate step serving to tip up prior business negotiations with future consequences which themselves are the real object of the business transaction." *Burger King*, 471 U.S. at 479 (internal quotation marks and citation omitted); *see also Schwarzenegger*, 374 F.3d at 802 ("The appropriate analysis for a suit 'sounding in contract' focuses on the presence of 'purposeful availment.'"). Thus, to determine whether a party to a contract has purposefully established the requisite minimum contacts with the forum, a court should look at four factors: (1) prior negotiations; (2) contemplated future consequences; (3) the terms of the contract; and (4) the parties' actual course of dealings. *Burger King*, 471 U.S. at 479. More specifically, "[t]o have purposefully availed itself of the privilege of doing business in the forum, a defendant must have

'performed some type of affirmative conduct which allows or promotes the transaction of business within the forum state.'" *Boschetto*, 539 F.3d at 1016; *see also Sinatra v. Nat'l Enquirer, Inc.*, 854 F.2d 1191, 1195 (9th Cir. 1988).

Because Crafty also asserts claims for breach of contract against Mr. Zhu and Ms. Faherty, the purposeful-availment analysis is also appropriate as to Mr. Zhu and Ms. Faherty. *See Schwarzenegger*, 374 F.3d at 802.

Mr. Zhu and Ms. Faherty both argue that they have not purposefully availed themselves to the privilege of conducting activities in California. Mr. Zhu emphasizes that: (1) "there is no evidence or allegation that Mr. Zhu himself created a substantial connection with the State of California"; (2) "Mr. Zhu did not travel to California in order to negotiate or execute the agreements"; and (3) "the agreements were meant to facilitate the manufacturing of craft products *in China*—in other words, the agreements promoted the transaction of business in China, not in California." (Zhu's Mot. 4:27-5:20; *see also* Zhu Decl. ¶ 7.) Ms. Faherty, less convincingly, contends that "[t]o the extent that Mrs. Faherty's alleged contacts with California were in response to CPI's initiated communications, such contacts do not support personal jurisdiction," and that "inter-party communications by phone or mail are insufficient to demonstrate purposeful availment." (Faherty's Mot. 6:8-21.)

In response to both motions, Crafty again relies on past interactions it describes as legitimate in addition to unsupported accusations of "facilitating" infringement. (Crafty's Zhu Opp'n 8:10-14 ("Clearly, by acquiring his infringing designs and products from CPI in California, selling over $16,000,000 in goods to CPI in California, offering to acquire CPI in California, and by signing all the agreements at issue, Zhu 'purposefully availed [him]self of the privilege of conducting activities in the forum.'"); Crafty's Faherty Opp'n 8:7-12 ("Clearly, by acquiring CPI's designs and products from California and facilitating the sale of over $16,000,000 in goods to CPI in California, as well as unknown numbers of sales of unauthorized, infringing products, Faherty "purposefully availed [her]self of the privilege of conducting

1  activities in the forum.'"").) These considerations are wholly inadequate to
2  demonstrate purposeful availment. *See Burger King*, 471 U.S. at 479.

3        Crafty fails to identify facts in the FAC or evidence submitted regarding where
4  prior negotiations occurred, the contemplated future consequences, and the terms of
5  the contract beyond forum-selection and choice-of-law provisions. *See Burger King*,
6  471 U.S. at 479. Crafty only describes the parties' past dealings, but lacks specific
7  facts regarding the actual course of dealings in California regarding the agreements
8  at issue in this case. *See id.*

9        Accordingly, Crafty fails to carry its burden and satisfy the purposeful-
10  availment prong of the specific-jurisdiction analysis with respect to Mr. Zhu and Ms.
11  Faherty. *See Burger King*, 471 U.S. at 479. Because Crafty fails to demonstrate Mr.
12  Zhu and Ms. Faherty purposefully directed tortious conduct to California or availed
13  themselves to the privilege of conducting activities in California, the Court cannot
14  exercise specific jurisdiction over Mr. Zhu and Ms. Faherty. *See Picot*, 780 F.3d at
15  1211.

16

17      **C.**    **Jurisdictional Discovery**

18        The decision whether to grant jurisdictional discovery is typically within the
19  discretion of the district court. *Wells Fargo & Co. v. Wells Fargo Exp. Co.*, 556 F.2d
20  406, 430 n.24 (9th Cir. 1977). "[W]here pertinent facts bearing on the question of
21  jurisdiction are in dispute, discovery should be allowed." *Am. West Airlines, Inc. v.
22  GPA Grp., Ltd.*, 877 F.2d 793, 801 (9th Cir. 1989). However, "where a plaintiff's
23  claim of personal jurisdiction appears to be both attenuated and based on bare
24  allegations in the face of specific denials made by the defendants, the Court need not
25  permit even limited discovery." *Pebble Beach Co. v. Caddy*, 453 F.3d 1151, 1160
26  (9th Cir. 2006) (quoting *Terracom v. Valley Nat'l Bank*, 49 F.3d 555, 562 (9th Cir.
27  1995)).
28  //

In their request for jurisdictional discovery, Crafty argues that jurisdictional discovery is needed to determine the extent of A.C. Moore's and Sbars' sales to California customers (Crafty's A.C. Moore Opp'n 6 n.4), veracity of Mr. Zhu's lack of California contacts in his individual capacity (Crafty's Zhu Opp'n 7 n.5), and truthfulness of certain representations made by Ms. Faherty (Crafty's Faherty Opp'n 5 n.2). The Court finds that these "purely speculative allegations of attenuated jurisdictional contacts" are insufficient to warrant jurisdictional discovery. *See Getz v. Boeing Co.*, 654 F.3d 852, 860 (9th Cir. 2011).

## IV.   CONCLUSION & ORDER

In light of the foregoing, the Court **GRANTS** Defendants' motions to dismiss, and **DISMISSES WITHOUT PREJUDICE** A.C. Moore, Sbars, Mr. Zhu, and Ms. Faherty from this action for lack of personal jurisdiction. (ECF Nos. 85, 88, 103, 104.) The Court also **DENIES** Crafty's requests for jurisdictional discovery.

**IT IS SO ORDERED.**

**DATED:  September 29, 2016**

Hon. Cynthia Bashant
United States District Judge